## KERR v. BOWERS.

### CLEGG v. SAME.

District Court, S. D. New York.
Jan. 23, 1931.

Noble, Morgan & Scammell, of New York City (John W. Davis, W. Osgood Morgan, and Montgomery B. Angell, all of New York City, of counsel), for plaintiffs.

Robert E. Manley, Acting U. S. Atty., of New York City (Samuel C. Coleman, Asst. U. S. Atty., of New York City, of counsel), for defendant.

GODDARD, District Judge.

These two actions were tried together without a jury upon stipulation, and were brought to recover, respectively, $1,677,005.-79 and $1,672,828.77 income tax assessed against the plaintiffs for the year 1920 by the Commissioner of Internal Revenue, and paid in 1927 after the plaintiffs had appealed to the Board of Tax Appeals and the Board had affirmed the order of the Commissioner. The taxes were paid under protest to the defendant's testator, Frank K. Bowers, then collector of internal revenue for the Second district of New York, who died during the pendency of these actions. Upon the abatement of the actions, they were continued against Mr. Bowers' executor under the provisions of U. S. C., title 28, § 778 (28 USCA § 778).

### Statement of Facts.

The facts in the two cases are substantially alike, and the taxable income in each instance, if there was taxable income, was derived from similar transactions under the same circumstances. Henry F. Kerr and Alfred E. Clegg, the plaintiffs, were, in 1920, residents of New York City, although subjects of Great Britain, and had been engaged in the business of operating steamships for a number of years. In September, 1919, there was a reorganization of the Kerr Steamship Company, Inc., in which they were both stockholders. Under the reorganization, Kerr received 11,547 shares of class A and 12,630 shares of class B stock in a new corporation, the American Ship & Commerce Navigation Corporation, a New York corporation, in exchange for 57,738 shares of stock which he owned in the old Kerr Steamship Company, Inc., which had cost him $5 a share, or a total of $290,740, and Clegg received 11,547 shares of class A and 12,629 shares of class B stock in the new corporation in exchange for his holding of 57,737 shares of stock in the old corporation, which had also cost him $5 a share, or a total of $290,735.

By virtue of agreements which had been entered into at the time of the reorganization, Kerr and Clegg had, upon the happening of a specified contingency, the option of selling the stock which each had thus received in the new company to the American Ship & Commerce Corporation, a Delaware corporation, a holding company which already owned the majority of the stock of the American Ship & Commerce Navigation Corporation, which was an operating company. The price which Kerr and Clegg each were to receive for their stock was approximately $2,400,000.

On July 24, 1920, the event occurred which gave Kerr and Clegg the right to exercise their option of selling their stock at the specified price to the American Ship & Commerce Corporation. After Kerr and Clegg had held several conferences with William A. Harriman, president of the American Ship & Commerce Corporation, and Mr. Ellis, attorney for the corporation, Kerr and Clegg, on August 27, notified them that they (Kerr and Clegg) would exercise their option to sell their stock to the corporation, and that the tender of this stock would be made to the corporation the next day, Saturday August 28, 1920.

In May, 1920, Walter B. Wight, an auditor in the Income Tax Unit of the Bureau of Internal Revenue, had been sent to New York to investigate the business affairs of Kerr and Clegg and the companies in which they were interested, and during his investigation, which continued for several months, he learned of the reorganization of the old Kerr Steamship Company, Inc., the exchange of stock, and the option for the sale of their stock to Harriman's company, and during the early part of the week ending August 28, 1920, he went to see Harriman and Ellis, and requested information regarding the situation, and learned that the sale of the stock was likely to take place shortly. Wight also learned that Kerr and Clegg, or some one acting in their behalf, had previously requested that the closing of the transaction take place in Montreal or London, and that the purchaser had refused. After keeping in close touch with them, on August 27, he ascertained that the transaction would be closed on the following morning. Wight had also received information that reservations for steamship passage to Europe had been arranged for so that Kerr could depart on Saturday August 28, and Clegg a few days later. Subsequently, however, it developed that the reservation was not intended for Clegg, the plaintiff, but for his brother. Wight kept in close communication by telephone and other means with the Bureau of Internal Revenue in Washington, transmitting the information he obtained from time to time during the week, and Mr. Harrison B. McCauley, the assistant solicitor of the Bureau, was instructed to do what he could to prevent Kerr and Clegg from leaving the country with the money from the sale of their stock. When, on August 27th, Wight learned that the transaction was to be closed the next day, he communicated by telephone to the Bureau, giving them the figures upon which the Act-

ing Commissioner of Internal Revenue on that day made a special or summary assessment of income taxes alleged to be due from Kerr and from Clegg. In computing the taxes, Wight took into consideration both the reorganization in 1919 and the proposed sale of the stock on August 28, 1920, and determined that upon the basis of either transaction the amount of tax would be substantially the same. Assessment certificates were accordingly issued by the Acting Commissioner of Internal Revenue on August 27, 1920, and the assessment list attached thereto purported to be an assessment of additional income tax in August, 1920. This assessment list purported to be the August special 1920 list of income tax against the plaintiffs, and showed the amount of tax to be $1,501,288.20 as due from each of the plaintiffs, or a total of $3,002,576.40 as due from both plaintiffs. Opposite the name of each plaintiff on the assessment list, and under the heading of "Remarks," appeared the words and figures "1920 Dummy S. A. 8/27/20," which meant that it was a special assessment of August 27, 1920, made where no return had been filed by the taxpayer. The Commissioner did not declare the taxable period terminated during the year 1920. The said assessment of August 27, 1920, was taken from Washington to New York by Daniel B. Priest, an assistant solicitor of internal revenue, and was received in the office of the collector of internal revenue for the second district of New York on the evening of August 27, 1920. On August 28, 1920, there was issued by said collector, addressed to each of the plaintiffs, a notice and demand for the tax so assessed, subpœnas to appear before the collector, and notices of a statutory lien for taxes. Said notices of lien were on the regular government form of "Notice of Tax Lien under Internal Revenue Laws," and asserted the lien provided for by Rev. Stat., § 3186, as amended (26 USCA § 115). A notice of lien was issued as to each of the plaintiffs for the income tax so assessed, and by its terms was a lien asserted against all property of the plaintiffs not exempt under Rev. Stat., § 3187 (26 USCA § 116 note). Certain of said notices recited the "Period of Liability" as the year 1920 and others as the year 1919.

On the morning of August 28, 1920, Kerr and Clegg, accompanied by their attorneys, Mr. Herbert Noble and Mr. Scott Scammell, and some others, went to the office of the American Ship & Commerce Corporation to deliver their stock and obtain payment. Mr. Ellis, attorney for the corporation, examined

the stock certificates, and, after finding them in order, inquired in what form payment was desired, and in reply was told that certified check would not do, and that legal tender was required; whereupon Harriman telephoned to the Chase National Bank and arrangements were made to obtain $4,913,819.60 in cash required to make payment, and also to close the deal at the bank instead of in Harriman's office. Accordingly, both groups adjourned to the Chase Bank and gathered about a table in the main banking room. In the meanwhile, having ascertained that Kerr and Clegg had demanded cash and that the closing was to take place at the Chase National Bank, Wight, McCauley, Priest, and Kostant, a deputy collector in the office of the collector of internal revenue for this district, went to the Chase Bank, taking with them the notices and other papers which had been prepared, and stationed themselves in various parts of the bank and the corridor leading to the street in such a manner as to know what was taking place and yet not be observed.

The statements of the several witnesses as to just what occurred and the sequence of what took place at the bank differ, but the weight of the testimony fully establishes the fact that the completed sale of their respective holdings of the stock by Kerr and by Clegg to the American Ship & Commerce Corporation for the agreed price in cash occurred, and that the representative of the corporation received the stock certificates which were tendered to him by Kerr and by Clegg, and that the cash in payment therefor was passed over to Kerr and to Clegg and accepted by them.

After the money had been paid over to Kerr and to Clegg and the Harriman group had left the table with the stock certificates and Kerr and Clegg also had started to leave the building after passing the money to Noble, who was counting it and placing it in a bag which Clegg's brother had brought for the purpose, and when Clegg and Kerr had reached the corridor on their way out of the building, the government officials stepped up to them and served them with the notice and demand for taxes and subpœna to appear before the collector of internal revenue and notice of a statutory lien. Notices of liens for taxes were also served upon Noble, and also pasted upon the bag containing the money.

The government officials refused to allow the plaintiffs to remove the money to their personal safe deposit boxes, and, after discussion, it was mutually arranged to have the bag containing the money placed in a vault of the Equitable Safe Deposit Company, and the bag was carried by a representative of Kerr and Clegg and by a government official to a safe deposit box of the Equitable Safe Deposit Company which was taken in the name of Clegg's brother and Noble. Notices of lien were pasted on the box, and the Safe Deposit Company was directed to allow no one to have access to the box except upon consent of either the Commissioner or the collector.

On August 31, 1920, the government filed copies of the notices of lien with the clerk of the United States District Court of this District. On September 7, 1920, the government consented to having the funds placed upon deposit with the Empire Trust Company of New York to be invested and the income paid to the plaintiffs, the principal to remain subject to the government's alleged lien for taxes. $300,000 of the principal was withdrawn by Kerr and Clegg in 1921 upon consent of the government. During 1920, both plaintiffs, in communication to the Shipping Board, stated that they desired to invest the funds "received as the gross proceeds of the sale of his interest * * *" in the building of ships in American ship yards, pursuant to the provisions of section 23 of the Merchant Marine Act of 1920, 46 USCA § 879 (which provides for exemption of income taxes). In letters of October 13, 1920, to the collector, the plaintiffs referred to the money which had been paid to them on August 28, 1920, as the proceeds arising from the sale of their stock and stated that the sum "was subject to the claim of the Government for an alleged lien on account of the above mentioned assessment for additional income tax for 1919." On September 15, 1920, after an extension of time had been granted, Kerr and Clegg filed with the collector of internal revenue their respective income tax returns for 1920. They kept their accounts and filed their returns on the cash basis. Neither included in his returns for 1920 the proceeds from the sale of their stock on August 28, 1920, but each filed an exhibit setting forth the transaction, but alleged that no income had been received by them from the transaction. Claims for the abatement of the taxes assessed on August 27, 1920, and designated by the Commissioner as additional taxes for 1919, were allowed, but at the same time they were notified that there were due from Kerr $1,564,400.30, and from Clegg $1,529,190.19, as additional taxes from the sale of their stock on August 28, 1920. On April 5, 1924,

Kerr and Clegg each filed a claim for abatement of the tax assessed against them for 1920 upon the grounds (1) that no profit was received in 1920 upon the sale of stock on August 28, 1920; (2) that prior to the proposed assessments they had appealed and had not been granted a hearing on their appeals as provided by section 250 (d) of the Revenue Act of 1921 (42 Stat. 265). On December 16, 1924, they were notified that their claims for abatement had been rejected. From the determination of the Commissioner appeals were on February 11, 1925, filed with the United States Board of Tax Appeals, which on January 5, 1927, approved the determination of the Commissioner.

From the foregoing facts, it is evident that the sale by Kerr and Clegg of their stock to the American Ship & Commerce Corporation was completed on August 28, 1920; also that Ellis, the attorney for the corporation, then received the stock certificates, and that Kerr and Clegg then received the legal title to the money which was paid to them. This much is conceded by counsel for the plaintiffs. However, it is urged in behalf of the plaintiffs that, by reason of the almost immediate intervention of the government officials, "there was no point of time within the year 1920 when Kerr and Clegg had 'actual possession' or were able to exercise 'effective control' or 'unfettered command' over the proceeds of the sale, i. e. there was no point of time in 1920 when such proceeds were subject to their 'separate use, benefit and disposal' and consequently they did not realize 'income' in 1920."

The result of this controversy depends solely upon whether Kerr and Clegg received, on August 28, 1920, taxable income from the sale of their stock; whether the purported liens were good or bad, I think is not determinative of the question. These are not suits to dissolve liens.

Kerr and Clegg were paid for their stock, and the price at which they sold it was greatly in excess of its cost to them. Profits derived from a sale of this character are taxable. Merchants' Loan & Trust Co. v. Smietanka, 255 U. S. 509, 41 S. Ct. 386, 65 L. Ed. 751, 15 A. L. R. 1305. It is clear that the money which was paid to Kerr and Clegg on August 28, 1920, included taxable income for 1920, unless the acts of the government officials relieved them from the payment of taxes on the ground that they had not as yet come into full use of the money because of the interference by the government officials. During the interval, short as it was, between the time when the sale of their stock was closed by the payment of the money to Kerr and Clegg and the time when the government officials appeared, Kerr and Clegg held the money free of any claim so far as the purchaser of their stock was concerned; they held it without restrictions from any one except in so far as third parties might attempt to reach it to satisfy claims or alleged claims against Kerr and Clegg. The corporation which had paid the stock transferred to Kerr and Clegg full and unrestricted ownership in the money, and Kerr and Clegg accepted this transfer; no limitations being placed upon the use of it by any one until after they had received it. The corporation concedes it has no further right in the money; every one, including Kerr and Clegg, says it belongs to Kerr and Clegg. The government itself contends that it had a lien against the money for the very reason that it was the money of Kerr and Clegg and that they had the unrestricted use of it. The situation, as I see it, is not that Kerr and Clegg did not receive profit and thus income which was subject to tax, but that they were deprived of the use of it by a stranger to the original transaction after that had been closed; therefore it seems to me that, no matter what happened to the money or to them immediately thereafter, it cannot be denied that they did actually receive the profit or taxable income, even though they were so soon to be deprived of the use of it.

I think it must be conceded that there was reason for concern and for such vigilance on the part of those charged with the duty of collecting the taxes, in view of all the circumstances, namely, the insistence by Kerr and Clegg, who were not American citizens, that this large amount should be paid to them in cash, the effort originally made by them to persuade the purchaser to close the transaction in Montreal or London, and, upon the purchaser insisting that the transaction should be closed in New York, the securing of steamship passage for Kerr for the evening of August 28, the day when the deal was to be closed, and for the early departure of Clegg, the plaintiff (as the government official then believed) from the United States to the country of which they were subjects, and where it would be difficult, if not impossible, to enforce the payment of taxes due the United States. See Moore v. Mitchell (C. C. A.) 30 F.(2d) 600, 65 A. L. R. 1354, reversed on other grounds 281 U. S. 18, 50 S. Ct. 175, 74 L. Ed. 673; Colorado v. Harbeck, 232 N. Y. 71, 133 N. E. 357. With the object of se-

curing payment of taxes, the government officials hastily prepared and served papers purporting to impress liens upon the money Kerr and Clegg had received for the sale of their stock.

Proceedings were never brought to have the alleged liens declared invalid, nor have they ever been held to be so. The acts of the government officials and the arrangements entered into with the plaintiffs and their attorneys for the deposit of the funds apparently were based upon the existence of these liens. In their communications of October 13, 1920, to the collector of internal revenue, Kerr and Clegg requested "exemption provided for in section 23 of the Merchant Marine Act of 1920" and stated that on September 7, 1920, there was placed in the hands of the Empire Trust Company of New York, "the sum of, * * * such sum representing the gross proceeds arising from the sale of, * * * such sale having been made by selling on the 28th day of August, 1920, certain shares of stock. * * * The sum above mentioned was subject to the claim of the government for an alleged lien on account of the above-mentioned assessment for additional income tax for the year 1919. * * * I request that as soon as the form of the investment shall have been determined and as soon as the United States Shipping Board shall have advised me as to the rules and regulations made, or to be made by them for setting aside this money in a trust fund for investment for the purposes above mentioned, you will authorize the Empire Trust Company, which now holds the fund, to transfer the same so as to make possible the proposed investment in American Flag Ships. * * * I desire to have a full hearing upon this claim for exemption." On March 9, 1921, when making application for an extension of time within which to file the income tax returns, the attorneys for the plaintiffs stated: "As you know, Messrs. Kerr and Clegg in August, 1920, sold a large amount of stock. * * * The amount of profit made by Messrs. Kerr and Clegg upon this sale of stock will depend upon whether they will have to pay back any of the proceeds of the stock to the Kerr Navigation Corporation."

■ Counsel for plaintiffs apparently take the position that any immediate interference with the use of the taxpayer's money by a third party, if involuntary on the part of the taxpayer, relieves him of the obligation to pay tax upon the profit derived from a sale until such limitation is removed. Accordingly, whether the asserted liens were valid or not, or whether the government officials, in their zeal, exceeded their power under the liens which they asserted, is immaterial. I agree with the proposition only to the extent that the test of whether taxable income is received is not whether the liens asserted were good or not. However, if proceedings to dissolve the liens had been brought by the plaintiffs, and they were successful in dissolving them, and the government officials then had prevented the funds from being withdrawn from the Empire Trust Company, redress from the court might well have been granted, but it seems to me the question then would not be whether Kerr and Clegg had received income, but whether they were illegally deprived of their property. In my judgment, the events which took place after Kerr and Clegg were paid the selling price which included taxable profit had no retroactive effect upon the receipt of such income, and the statute when it defines income is not concerned with what happens to it subsequently, although it is conceivable that events might occur subsequently which would entitled them to a deductible loss.

Counsel for plaintiffs refer to Eisner v. Macomber, 252 U. S. 189, 40 S. Ct. 189, 64 L. Ed. 521, 9 A. L. R. 1570, as supporting their contention that Kerr and Clegg received no taxable income in 1920. In Eisner v. Macomber, supra, the Supreme Court had under consideration the question whether stock dividends were taxable. Specifically counsel refer to the following statement of Mr. Justice Pitney, on page 207 of 252 U. S., 40 S. Ct. 189, 193: "'Income may be defined as the gain derived from capital, from labor, or from both combined,' provided it be understood to include profit gained through a sale or conversion of capital assets. * * * A gain, a profit, something of exchangeable value, proceeding from the property, severed from the capital, however invested or employed, and coming in, being 'derived'—that is, received or drawn by the recipient * * * for his separate use, benefit and disposal—that is income derived from property. Nothing else answers the description." The question of profit derived from the sale of property was not involved. Receipt of income arising out of and severed from capital was the only question in the case. It was held that income to be taxable, income from property, must be severed from that property before a taxpayer can be regarded as receiving it. There the court held that the taxpayer received nothing, for after the stock dividend he had no more or no less than he

had before. If it had been "severed," he would have received taxable income. In the case at bar, there was a complete transfer of the money by the purchaser to Kerr and Clegg. There is no question here as to severance. Any interference with the use of the money by Kerr and Clegg arose after they received the money, and came from another source.

I doubt if it would be seriously contended that a person receives no taxable income so long as a lien filed by the government against that income exists and restricts or interferes with his full use and control of it, whether the lien against it is created immediately upon his coming into the money or later; whether the lien is good or bad. The purpose of a lien is to limit the use of the property upon which a lien is placed, so as to provide security for the payment of a claim. Liens are expressly authorized under the statute.

Following plaintiffs' theory to its logical conclusion, let us assume that Kerr had gone to the steamship pier on the night of August 28, 1920, for the purpose of departing for foreign lands as he had planned to do, and had the cash received from the sale of his stock in his pocket, and that the government officials had, pursuant to a prearranged plan by them in an effort to secure payment of taxes, served papers upon him and prevented him from taking the money out of the country. Would it be said that he had received no income because of their interference with his "unfettered use or control of the money"? Or assume that the same thing had happened to Clegg if he had departed somewhat later.

Counsel for plaintiffs contend that Kerr and Clegg received no taxable income on August 28, 1920, from their sale of stock, as they were deprived of the use of it, and refer to the following as a similar illustration: Suppose that a band of marauders had reached over the shoulders and lifted this money from the table after the owners of it had merely the same transitory possession of it that is asserted here, and disappeared with it, "and suppose that the Government had then come down on these people with an assessment of three million dollars, with no assets out of which it could be paid, is it conceivable that they could be held to have received income to have gained out of that transaction. Now, that we think, is precisely what happened here." My understanding,

however, of such a situation is that under the taxing statutes the money so received is regarded as taxable income and is to be accounted for by the taxpayer in his income tax report, but the relief for the taxpayer is found in section 214 (a) (6) of the Revenue Act of 1918 (40 Stat. 1067), which provides that if such a loss occurs, it may be deducted from his total income in that taxable year including the profit from the sale; the amount of the deduction to which he would be entitled being not merely the profit he was deprived of, but the entire amount so lost. While this may be a technical distinction, nevertheless it, I am quite sure, would be the correct treatment of such a situation under the statute and is a fair rule, and it must be conceded that the position taken by the eminent counsel for plaintiffs is a technical one. The question as to whether the plaintiffs did sustain a deductible loss of such character is not before the court, but in this connection all the circumstances should be borne in mind, including the fact that they at least had legal title to the fund and received the income from it.

Corliss v. Bowers, 281 U. S. 376, 50 S. Ct. 336, 337, 74 L. Ed. 916, is also cited by counsel for plaintiffs as supporting their contention, in which the Supreme Court held that, where one had transferred a fund to trustees to pay the income to his wife and for life, with remainder over to their children, but retained the power to abolish or revoke the trust at any time, the income was under the statute taxable to him, and Mr. Justice Holmes said: "The income that is subject to a man's unfettered command and that he is free to enjoy at his own option may be taxed to him as his income, whether he sees fit to enjoy it or not." 281 U. S. page 378, 50 S. Ct. 336, 74 L. Ed. 916. The court said, whether he had title to the property or not, he did have the power to regain the title, and that income which is subject to a man's unfettered command which he is free to enjoy at his own option may be taxed to him as income whether he sees fit to enjoy it or not. In the case at bar, there passed to the plaintiffs full title to the money without limitation upon its use. All restrictions were initiated by a third party, and came into existence after title and use of the money had passed to Kerr and Clegg and was based upon this fact.

Accordingly, I think the defendant is entitled to judgment in both cases.